IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

UNITED STATES OF AMERICA,

v.

CHARLES BARRERAS,

       Defendant.

CASE NO.: 2:19-cr-41

FILED
Scott L. Poff, Clerk
United States District Court

*By casbell at 4:15 pm, Nov 25, 2019*

## ORDER AND MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant Charles Barreras has been indicted on one felony count of attempted coercion and enticement of a minor. Doc. 1. Defendant moves to suppress certain statements he made while in law enforcement custody following his arrest. Doc. 29. Specifically, Defendant disputes whether he waived his Miranda rights and also disputes whether he invoked his right to remain silent during an interrogation with law enforcement officers following his arrest. Id. The Government opposes Defendant's Motion. Doc. 34. The Court conducted a hearing on the matter on October 18, 2019. Doc. 45. For the reasons that follow, I **RECOMMEND** the Court **DENY** Defendant's Motion to Suppress.

**I.    Defendant's Statements**

The Government alleges Defendant travelled to St. Marys, Georgia on March 28, 2019 to have sex with a person he had been communicating with online and who Defendant believed to be a 15-year-old child, but who was, in fact, an undercover agent. Doc. 34 at 2. After Defendant drove to an agreed upon location and asked the individual, via text message, to come outside, Defendant drove away. Id. at 3. Defendant was apprehended and arrested soon thereafter. Id.

Immediately following his arrest, Defendant was taken to the house where the police were running their operation. Defendant was brought to an interview room and interrogated. Doc. 34-4 at 1. The interrogation can be broken down into two parts. Docs. 34-4, 34-5. During the first portion, four officers—Special Agent Kenney (NCIS); Special Agent Mario Velez (NCIS); Special Agent Michael Wright (NCIS); and Detective Kyle Taylor (Camden County Sheriff's Office)—questioned the Defendant for nearly an hour. Doc. 34-4 at 1. Immediately after the first portion of the interrogation, Defendant was taken to a different room and questioned for approximately one more hour by Agents Kenney and Wright. Doc. 34-5. Law enforcement recorded full audio of both portions of the interrogation, and had that audio transcribed. Some of the second portion of the interrogation was also recorded on video.[1]

At the outset of the first portion of the interrogation, Agent Kenney asked Defendant for general, biographical information. Id. at 2–8. The officers searched him. Id. at 9–11. Defendant read aloud that he understood he is a "suspect in the solicitation of a minor, child sex assault, with solicitation of child pornography." Id. Then, reading aloud from a Miranda waiver form, Defendant stated, "I have decided that I do not desire to remain silent or retain a lawyer or have a lawyer present at this time. I made this decision freely and voluntarily. No

---

[1] The Government provided four media files to the Court, labeled "Government's Exhibit F." The first file contains an audio-only recording of the first portion of the interrogation. The corresponding transcript for that recording can be found at doc. 34-4. The second file contains an audio-only recording of the second portion of the interrogation. The corresponding transcript for that recording can be found at doc. 34-5. The Court cites extensively to both of these transcripts throughout this Order. The third media file contains a video recording which begins 26 minutes into the second portion of the interrogation, when Agent Wright realizes the video camera did not start recording. Doc. 34-5 at 14. This video captures the rest of the interrogation, then continues for 20 minutes beyond the corresponding audio recording & transcript. The fourth media file is another video which takes place after the third and lasts for an additional 15 minutes. During the last 35 minutes of video (after the Defendant requests an attorney), Agent Wright and the Defendant make small talk, but do not discuss the events of that evening any further. In total, the media files document approximately two and a half hours of Defendant's custody. He is questioned for two of those hours, which are recorded and transcribed. The last half hour, after the Defendant requests an attorney, is spread over two separate video files and is not transcribed.

threats or promises have been made to me." Doc. 34-3. Agent Kenney asked Defendant if he was willing to talk, assuring him he could stop at any time, and Defendant agreed. Doc. 34-4 at 12. Defendant signed the waiver and proceeded to answer questions from the officers. Id.

During the interrogation, Defendant recounted the days leading up to his arrest. Id. at 12–14. Defendant was, at the time, an active U.S. Navy officer. Id. Defendant had been transferred from San Diego, California to Kingsland, Georgia, and drove the full distance between the two cities from March 15th to March 24th.[2] Id.; Doc. 29 at 5. He told the officers that on March 25th he rested at a friend's home, on the 26th he went to a job interview in Jacksonville, on the 27th he visited the Veterans Affairs clinic in Savannah and stayed in a hotel overnight, then he drove to Beaufort, South Carolina, for another Veterans Affairs appointment on the 28th. Doc. 34-4 at 13–14; Doc. 29 at 5. Defendant returned to St. Marys on the 28th and prepared to go to bed. Doc. 34-4 at 16. Defendant explained that, at that point, he began messaging with the undercover agent. Id.

Later during the interrogation, Agent Kenney began asking Defendant about the age of women Defendant is attracted to and, after a few questions, Defendant said, "I don't really want to talk about it," to which Agent Kenney replied, "[O]kay, fair enough," and moved to a different line of questioning. Doc. 34-4 at 31. The agent also asked Defendant about his laptop computer, to which Defendant said, "I don't want to discuss the laptop." Id. at 42.

Also relevant to the matters before the Court, Defendant told the arresting officers he was not impaired by any drugs. Defendant only mentioned that he was prescribed an antidepressant, to which Agent Kenney said a nurse, who would arrive in the morning, could get the medication

---

[2] During the hearing on Defendants' Motion, Defendant testified that he had spent much of the week before his arrest on the road and slept little due to the stress of upheaving his life.

3

for him.  Id. at 39.  Toward the end of this interrogation, this exchange about Defendant's medication occurred:

<blockquote>

Kenney:       What have you taken today?  Let me ask that real quick.

Defendant:    Just my prescription medicine.

Kenney:       Your prescription.

Defendant:    Wellbutrin and Zoloft

Kenney:       Okay, and when did you take it?

Defendant:    I take it every morning at like around 7.

Kenney:       And that's the last time you took it?

Defendant:    Yeah.

Kenney:       How does that affect you?  Does it affect you at all?  I mean, you still drove here, right?

Defendant:    Yeah, no, it doesn't affect me, like makes me delirious or anything.

Kenney:       Does it—okay, does it cause—does it mentally impair you at all or anything?

Defendant:    It increases—Zoloft increases your serotonin level.

Kenney:       Yep.

Defendant:    So it helps you be in a better mood, I guess.

Kenney:       Yeah . . . What was the other one you said?

Defendant:    Wellbutrin.

Kenney:       Wellbutrin?  That one, I've heard of it.  What's that one for?

Defendant:    It's the same thing, treats depression.

</blockquote>

Id. at 46–47.

Following the first portion of the interrogation, Defendant was brought to a different room, where he was questioned by only two of the agents, Agent Kenney and Agent Wright. Doc. 34-5 at 1.  This second portion of the interrogation was video recorded.  Doc. 34-5 at 14.

4

Nearly two minutes into the second portion of the interrogation, the following exchange occurred:

> Wright: Okay, what's some of the—do you do searches on like Pornhub for any genre?
>
> Defendant: Um, it's like—
>
> Wright: Like I'm used to asking, what are you interested in? A threesome?
>
> Kenney: He told me teen earlier, I mean, that's—a teen?
>
> Defendant: I click—I click on all the different things, I mean, like I said I just look at different stuff.
>
> Wright: Whatever you're in the mood for that day or—
>
> Defendant: Yeah.
>
> Wright: Okay, kinda like TV, if you switch the channels, things of that sort?
>
> Defendant: Yeah.
>
> Wright: That aspect, that this is unusual for you—how did you end up here? I mean, what—what changed today that was different than any other day?
>
> Defendant: I don't know. I don't really want to talk about it anymore.
>
> Wright: Okay. And, you know, that's completely up to you. The point that I was gonna make is the last three guys that came in here, it was a progression aspect. They started, you know, looking at threesomes, twosomes, whatever, then they go to teens, and then they, you know, some people stop there, some people go beyond. Which did—were you the—
>
> Kenney: 15-year-old.
>
> Wright: 15-year-old, okay. Well, that's good. And you didn't do it that long for the—okay, would it be fair to say if you looked at, you know, you find teen girls attractive?
>
> Defendant: It would be fair to say that, yes.

5

Id. at 1–2.  The officers continued asking about Defendant's attraction to teenage girls, and Defendant continued answering their questions.  Id. at 2.  As portrayed by the recording of the interrogation, Defendant seems to sit calmly in his chair.  Doc. 47, Gov't Ex. F.  He yawned, and at one point, apologized for doing so.  Doc. 34-5 at 21.  Nearly 40 minutes into the second portion of the interrogation, the following exchange occurred:

> Defendant: And so I did that, and then you brought up the laptop but, you know, I'm smart enough to know that at a point, I wanna talk to a lawyer and all that kinda stuff.
>
> Wright: Is that what you want to do?
>
> Defendant: Eventually I'm going to, yeah.
>
> Wright: I mean, do you—and, you know, it's a whole—a whole, you know, legal aspect, you know?
>
> Defendant: It is.
>
> Wright: I can't give you legal advice or anything like that.  If you want me to stop asking questions, but –
>
> Defendant: I'm not gonna answer any more of your questions.

Id. at 22.  The agents continued the interrogation, but the Government asserts it will not seek to admit any statements after the point during the second portion of the interrogation when Defendant said, "I'm not gonna answer any more of your questions."  Id. at 22–30; Doc. 34 at 6.

Defendant moves to suppress his statements made during the interrogation and requested an evidentiary hearing.  Doc. 29.  The Government responded, opposing suppression, contending Defendant had executed a valid waiver of his Miranda rights.  Doc. 34.  The Government pointed out procedural deficiencies in Defendant's Motion, which Defendant subsequently cured and which the Court does not address in this Order.[3]  Doc. 41.  The Court

---

[3] The Government moved to strike Defendant's Motion for failure to comply with Local Rule 12.1 because Defendant did not attach an affidavit to support facts not in the record.  Doc. 34 at 5.  Defendant

6

held an evidentiary hearing on the matter on October 18, 2019 and heard testimony from Special Agent Thomas Kenney, who was present during both interrogations of Defendant, and from Defendant, Charles Barreras.   Doc. 45.

During the evidentiary hearing, Defendant alleged some facts that were inconsistent with or contradicted some of his statements during the interrogation.   Doc. 45.   Defendant stated he had no recollection of reading his Miranda rights the night of his arrest because he was tired and focusing on his shoulder, which had been injured during his arrest.   Doc. 45; Doc. 34-4 at 15 ("When they threw me on the . . . pavement, they cracked my shoulder up.").   Although Defendant conceded that in the present day, he would understand the consequences of waiving his right to remain silent, he testified that on the night he was arrested, he could not "remember what . . . [he] was thinking and if [he] had any information to what the consequences would have been."   Doc. 45.   However, he also testified he could remember reading and understanding the authorization form granting the police access to his cell phone, and he did remember being told he could write a letter to the district attorney.   Id.   Defendant also testified that the night he was arrested, he had consumed four beers and an antidepressant, Trazodone, which caused him to become drowsy, despite having told officers during the interrogation he had not taken any drugs that impaired him.   Id.   Defendant also testified he had not taken his prescribed medicine that morning, which altered his mood.   Id.

**II.   Discussion**

Defendant argues that due to sleep deprivation, missed medication, a shoulder injury acquired during his arrest, and a police-dominated atmosphere, his waiver of Miranda rights was not voluntary, knowing, or intelligent, and thus, not effective.   Id. at 8; see Jackson v. Denno,

---

amended his Motion, attaching a signed affidavit.   Doc. 41.   Thus, the Court denies the Government's request to strike Defendant's Motion on these grounds.

378 U.S. 368 (1964). Defendant also argues that questioning should have ceased when he asserted his right to remain silent (i.e., revoked any waiver of Miranda rights). Doc. 29 at 7. Defendant argues that he expressed his desire to stop the interrogation, and, therefore, revoked his waiver at three points during the interrogation:

(1) Defendant states, "I don't really wanna talk about it" approximately 40 minutes into the first portion of the interrogation (referred to herein as "Statement One");

(2) Defendant states, "I don't really want to talk about it anymore" approximately two minutes into the second portion of the interrogation (referred to herein as "Statement Two"); and

(3) Defendant states, "I am not going to answer any more of your questions" approximately forty minutes into the second portion of the interrogation (referred to herein as "Statement Three").

Id.

The Government responds that Defendant understood the waiver, appeared alert, rational, and articulate, and claimed to be unaffected by his medication, and as such, his signed waiver is valid. Doc. 34 at 7–10. The Government argues Defendant's Statement One and Statement Two do not constitute revocation of Defendant's waiver of his Miranda rights, and, therefore, officers were not required to cease the interrogations at either of those two points. Additionally, the Government states it will not attempt to offer, in its case-in-chief, any statements made after Statement Three.[4] Id. at 6. Thus, the Court must determine whether Defendant's waiver was valid, and, if so, whether Defendant revoked the waiver in Statement One or Statement Two.

---

[4] While the Government does not concede Statement Three revoked Defendant's waiver of his Miranda rights, the practical effect of the Government's position is that any request to suppress statements made after Defendant's Statement Three would be moot because the Government will not be using those statements at trial. Thus, the Court need not determine whether Statement Three was a valid revocation of Defendant's Miranda rights.

8

### A.  Waiver of Miranda Rights

In Miranda, the Supreme Court determined that any custodial interrogation of a suspect involves "inherently compelling pressures which work to undermine the individual's will to resist and compel him to speak where he would not otherwise do so freely." Miranda v. Arizona, 384 U.S. 436, 467 (1966). Therefore, the Court created a presumption that evidence produced by custodial interrogation is coerced unless a suspect is first informed of his constitutional right to remain silent and the right to have an attorney present during any questioning. Id. The suspect must be informed that any statement he makes may be used as evidence against him and that he has a right to appointed counsel. Id. at 444–45. Without such warnings, the government may not use a statement obtained from a suspect who was in custody at the time he was questioned by the police. Id. If the accused invokes his right to remain silent, "the interrogation must cease." Id. at 474. If the accused indicates "in any manner" that he wishes to consult with an attorney, "the interrogation must cease until an attorney is present." Id. at 444, 474. The government bears the burden of showing, by preponderance of the evidence, that a defendant's in-custody statements were obtained in compliance with Miranda and were otherwise voluntary. Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004); Colorado v. Connelly, 479 U.S. 157, 168 (1986); Miranda, 384 U.S. at 475. In the instant case, it is undisputed that Defendant was advised of each of his Miranda rights. Doc. 34-4 at 11. Consequently, the first question for consideration is whether he validly waived the exercise of those rights. North Carolina v. Butler, 441 U.S. 369, 374 (1979).

A Miranda waiver must be made knowingly, intelligently, and voluntarily. Miranda, 384 U.S. at 436, 444, 475. The Supreme Court has split analysis into whether the waiver was (1) voluntary, and (2) made knowingly and intelligently:

> The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979) (citations omitted)); Colorado v. Spring, 479 U.S. 564, 573–74 (1986); Edwards v. Arizona, 451 U.S. 477, 483–84 (1981); United States v. Wright, 300 F. App'x 627, 630 (11th Cir. 2008). Only if the totality of the circumstances proves both the requisite level of comprehension and an uncoerced choice may a court properly conclude that Miranda rights have been waived. United States v. Ransfer, 749 F.3d 914, 935 (11th Cir. 2014).

    *1. Voluntary*

In assessing the voluntariness of a Miranda waiver, the specific focus is on whether the police overreached; factors to be considered are "the [accused's] lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001); Waldrop v. Jones, 77 F.3d 1308, 1316 (11th Cir. 1996). However, a suspect's "signing of the waiver form, though not conclusive, is 'usually strong proof' of the voluntariness of the waiver." Hart v. Attorney Gen. of State of Fla., 323 F.3d 884, 893 (11th Cir. 2003) (citing Blasingame v. Estelle, 604 F.2d 893, 896 (5th Cir. 1979)). Finally, the Supreme Court has held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." Connelly, 479 U.S. at 167.

The totality of the circumstances demonstrates Defendant fully understood his rights to counsel and to remain silent and voluntarily waived those rights. It is undisputed that on the night of Defendant's arrest, Agent Kenney presented Defendant with the specific charges under investigation and a waiver form describing his Miranda rights, after which Defendant read the form aloud, stated he understood it, and signed the form. Doc. 34-4 at 11. Defendant alleges a coercive atmosphere, but there is no indication he was coerced. See Fare v. Michael C., 442 U.S. 707, 726–27 (1979) (Defendant was "not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit . . . The officers did not intimidate or threaten respondent in any way. Their questioning was restrained and free from the abuses that so concerned the Court in Miranda."). The video of his interrogation shows Defendant sat calmly in a chair while he spoke with Agent Wright. Doc. 47, Gov't Ex. F. He was questioned immediately after his arrest and for only two hours. Doc. 34-4 at 19. The agents made no promises in exchange for Defendant's cooperation, nor did they provide any indication that Defendant's participation in the interview would influence the decision whether to bring charges against him. The interrogation was not overly repetitive, nor prolonged, and Defendant was advised he could stop at any time. Doc. 34-4 at 12.

Defendant's speech is not confused, irrational, or incoherent; he appears to be alert and aware of what is happening. Docs. 34-4, 34-5, 47; Gov't Ex. F. Although Defendant testified that he had alcohol and a sleeping pill the night of his arrest and that he had missed his medication earlier that day, Defendant told the officers during the interrogation he had not taken any drugs that impaired him. Doc. 34-4 at 34. Indeed, although Defendant yawned several times, he otherwise did not appear impaired at all, and the officers conducting the interrogation did not believe Defendant to be impaired or in any diminished mental state. See United States

11

v. Augustine, 742 F.3d 1258, 1265 (10th Cir. 2014) (finding Miranda waiver valid where defendant, who appeared sober in recording of interrogation, told officers he was not under the influence of alcohol or drugs but did take a number of prescription medications, and throughout the interview sporadically indicated a desire to take his medications but never indicated to the officers that he could not, or would not, continue the interrogation without his medication). Furthermore, there is no allegation that Defendant's exhaustion was the result of affirmative action by the police.  See Devier v. Zant, 3 F.3d 1445, 1460 (11th Cir. 1993) (finding confession voluntary because no affirmative, official act deprived defendant of sleep); Moore v. Duggar, 856 F.2d 129, 132 (11th Cir. 1988) (finding confession voluntary due to no police coercion, although defendant had not slept or eaten for more than 24 hours); Surace v. Wainwright, 637 F. Supp. 460, 462–63 (S.D. Fla. 1986) (finding confession voluntary because interviewing officer testified that defendant's eyes were clear, his breath did not smell of alcohol, he read and signed a Miranda waiver, and he spoke in a "free and relaxed manner," despite asking for a doctor at one point, and afterward testifying he was "drunk, tired, and ill" while in custody).

The characteristics of Defendant do not indicate an inability on his part to resist pressure—indeed, quite the opposite.  At the time of the interrogation, Defendant was 48 years old, could speak and read English, had obtained a bachelor's degree, and was a Lieutenant Commander in the Navy with a top secret clearance.  Doc. 34-4 at 2.  Therefore, and based on the totality of the circumstances, the Court finds Defendant's waiver of his Miranda rights to be voluntary.

> 2.  *Knowing and Intelligent*

The totality of the circumstances also proves that Defendant knowingly and intelligently waived his Miranda rights.  Moran, 475 U.S. at 421; Coleman v. Singletary, 30 F.3d 1420, 1426

(11th Cir. 1994).   On this issue, Defendant asserts many of the same arguments urged on the issue of voluntariness.   That is, Defendant argues that his mental impairment caused by drugs, alcohol, and lack of sleep prevented him from understanding his Miranda rights and the effect of a waiver.   Yet, "[a] criminal suspect is not required to know and understand every possible consequence of a waiver for it to be knowingly and intelligently made."   United States v. Gaddy, 894 F.2d 1307, 1312 (11th Cir. 1990).   For a waiver to be knowing and intelligent within the meaning of Miranda, it is only necessary the suspect understand "that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time."   Id. (quoting Spring, 479 U.S. at 574).   Additionally, courts consider mental health as part of the totality of the circumstances.   Miller v. Dugger, 838 F.2d 1530, 1539 (11th Cir. 1988).   To do so, a court relies "on the objective indicia of a defendant's mental state[.]"[5]   United States v. Sonderup, 639 F.2d 294, 297–98 (5th Cir. 1981).

The record shows Defendant read his Miranda rights and acknowledged that he understood he could stop at any time.   Doc. 34-4 at 12.   Although he yawned, he also carried on a conversation with his interrogators, answered their questions, and appeared lucid.   Doc. 45.   When asked to search his phone, he weighed his options and permitted the agents access.   Doc. 34-4 at 18–20.   When asked about his laptop, Defendant considered the issue but rebuffed inquiries and declined to consent to any search.   Doc. 34-4 at 36.   Even if Defendant now says he missed his prescribed antidepressant, drank four beers, and took a sleeping pill the night of his arrest, he told his interrogators that night he had not taken drugs that impaired him.   Doc. 34-4 at 35.   In any case, a defendant's mental health problems or displays of odd behavior during an

---

[5]   The objective indicators of a defendant's mental state "are that Defendant was informed in clear and unequivocal terms of each of his Miranda rights and that Defendant said, or by his conduct indicated, that he understood them and wished to waive them."   United States v. Sonderup, 639 F.2d 294, 297–98 (5th Cir. 1981).

interrogation do not render his waiver unintelligent unless they so "significantly impair" his cognitive abilities that he is incapable of understanding the Miranda warning.  Miller, 838 F.2d at 1539.  Agent Kenney testified that Defendant "never seemed in a depreciated state."  Doc. 45.  Therefore, even if Defendant now says he cannot remember waiving his Miranda rights, there is no persuasive evidence that his waiver was not knowing and intelligent.  The objective indicia show that Defendant was sufficiently competent to waive his rights.

In summary, Defendant's decision to waive his Miranda rights was not the result of intimidation, coercion, or deception.  There is no evidence that Defendant's will was overborne and, thus, involuntary.  Similarly, even if Defendant was under the influence of alcohol or a sleeping pill, the evidence supports a finding that he understood the nature of his Miranda rights while he was interrogated and consciously decided to waive those rights and speak with investigators.  Accordingly, Defendant's Miranda waiver was validly executed.

### B. Revocation of Miranda Rights

Because Defendant validly waived his Miranda rights, the Court must determine whether—and, if so, when—Defendant revoked that waiver.  There are three points during the interrogation at which Defendant potentially revoked his waiver of Miranda rights.  The Court addresses the statements in the order they were made.

*Statement One*.  Approximately 40 minutes into the interrogation, Defendant first expressed reluctance to answer a question:

| | |
|---|---|
| Kenney: | And one last question, so something I forgot that we always ask, you know, when I talk to people.  So, hey, I'm a guy, I like girls too.  Obviously, tonight, this 14 or 15—14? |
| Taylor: | 15. |
| Kenney: | 15?  15's attractive, right?  What's—is 13 attractive? |
| Defendant: | No. |

14

| | | |
|---|---|---|
| Kenney: | 10? | |
| Defendant: | No. | |
| Kenney: | No? | |
| Defendant: | No. | |
| Kenney: | Is it 14 or 15 maybe, or— | |
| Defendant: | The 15 thing was interesting, I guess, for better words tonight. | |
| Kenney: | Okay, interesting? I mean, they're—they're, you know, they already hit puberty, so they have boobs and stuff like that, so— | |
| Defendant: | I guess, yeah. | |
| Kenney: | I mean, you tell me, that's why I'm asking. | |
| Defendant: | ***I don't really wanna talk about it.*** | |
| Defendant: | Okay, fair enough. | |

Doc. 34-4 at 31 (Statement One is in bold and italics). Defendant contends he invoked the right to remain silent when he said, "I don't really wanna talk about it." Id. At this point, Defendant had already executed a valid waiver of his Miranda rights. Id. at 11.

Once a suspect waives the right to remain silent, a subsequent revocation of that waiver must be unequivocal. See Davis v. United States, 512 U.S. 452, 461–62 (1994); Coleman, 30 F.3d at 1424. The suspect's revocation is judged objectively, such that "a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent." Id. Indeed, "[i]f the statement is ambiguous or equivocal, then the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation." Id.

When Defendant said, "I don't really wanna talk about it," he did not unequivocally invoke his Fifth Amendment right to remain silent. Indeed, a defendant's selective responses to questions does not negate a waiver of Miranda. United States v. Boon San Chong, 829 F.2d 1572, 1574 (11th Cir. 1987) (holding suspect's refusal to sign waiver did not render further

15

questioning improper because suspect "never requested an attorney and because he chose to answer some questions but not others").   Here, Defendant was declining to discuss one specific topic—his attraction to underage girls.   He does not express an unequivocal or unambiguous desire to discontinue the interrogation or to request counsel.   This conclusion is reinforced by the fact that, after this exchange, Agent Kenney changed the subject, and Defendant continued answering his questions, without any additional push back.   Doc. 34-4 at 31.   Therefore, Statement One does not constitute a revocation of Defendant's Miranda waiver.

   *Statement Two***.**   Just over an hour into Defendant's interrogation, approximately two minutes after he was moved into a different room with just two agents, Defendant again expressed some reluctance to answer questions:

   Wright:         Mm-hmm, and what's your preference that you use to look for?

   Defendant:     I look at everything.

   Wright:         Okay, what's some of the—do you do searches on like Pornhub for any genre?

   Defendant:     Um, it's like—

   Wright:         Like I'm used to asking, what are you interested in?   A threesome?

   Kenney:        He told me teen earlier, I mean, that's—a teen?

   Defendant:     I click—I click on all the different things, I mean, like I said I just look at different stuff.

   Wright:         Whatever you're in the mood for that day or—

   Defendant:     Yeah.

   Wright:         Okay, kinda like TV, if you switch the channels, things of that sort?

   Defendant:     Yeah.

16

| | | |
|---|---|---|
| Wright: | | That aspect, that this is unusual for you—how did you end up here?  I mean, what—what changed today that was different than any other day? |
| Defendant: | | I don't know.  ***I don't really want to talk about it anymore.*** |
| Wright: | | Okay.  And, you know, that's completely up to you.  The point that I was gonna make is the last three guys that came in here, it was a progression aspect.  They started, you know, looking at threesomes, twosomes, whatever, then they go to teens, and then they, you know, some people stop there, some people go beyond.  Which did—were you the— |
| Kenney: | | 15-year-old. |
| Wright: | | 15-year-old, okay.  Well, that's good.  And you didn't do it that long for the—okay, would it be fair to say if you looked at, you know, you find teen girls attractive? |
| Defendant: | | It would be fair to say that, yes. |

Doc. 34-5 at 2 (Statement Two is in bold and italics).

Defendant's statement, "I don't know.  I don't really want to talk about it anymore," was in response to Agent Wright asking what had changed that day, meaning what had caused Defendant to allegedly go meet a teenage girl, rather than watch pornography on the internet.[6] Id.  As with Statement One, the record suggests Defendant did not want to address the specific question, but that he was open to talking about other topics because he continued to answer

---

[6] After Defendant made the statement, Agent Wright did not clarify whether Defendant wished to invoke his Miranda rights.  Doc. 34-5 at 22.  Agent Wright's failure to clarify, however, did not obligate him to cease questioning.  Under Davis v. United States, "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants [to invoke the Miranda right]."  Davis, 512 U.S. at 461.  "Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel."  Id.  However, in that case, the Court refused to adopt a bright-line rule requiring officers to ask clarifying questions.  Id.  The Court clarified, "[i]f the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him."  Id. at 461–62.  Accordingly, even if Defendant's Statement Two were ambiguous, Agent Wright's failure to clarify whether Defendant wanted to stop the interrogation or whether Defendant wanted an attorney does not constitute a Fifth Amendment violation.  Id.

17

questions immediately after making both statements.  Doc. 34-5 at 22; compare United States v. McWhorter, 515 Fed. App'x 511, 517 (6th Cir. 2013) (suspect's statement, "I don't want to talk to you anymore," found to be merely a response indicating the suspect did not want to talk about the subject of police force, not an invocation of the right to remain silent); United States v. Youngbear, No. 14-CR-46, 2015 WL 263397, at *5 (N.D. Iowa Jan. 21, 2015) (finding suspect's statement, "I don't want to talk about this anymore," was a qualified statement directed at questions about hitting his alleged victim which invoked defendant's right to remain silent on this topic only); with United States v. Heine, No. 3:15-cr-238, 2016 WL 6808595, at *23 (D. Ore. Nov. 17, 2016) (suspect's statement "I really don't want to say anymore," made ten minutes into interrogation unambiguously invoked right to remain silent).  The facts in this case do not support Defendant's assertion that he wished to remain silent from this point forward. Defendant did not unequivocally invoke silence as to any question, he merely rejected the question, "What changed today that was different than any other day?".  Doc. 34-5 at 2. Defendant's statement does not meet the "unambiguous or unequivocal" standard of Davis; thus, Defendant did not revoke his waiver of Miranda rights.  Davis, 512 U.S. at 462.

   ***Statement Three.***   Near the end of the second hour of interrogation, the following exchange occurred:

> Wright:     I mean, do you—and, you know, it's a whole—a whole, you know, legal aspect, you know?
>
> Defendant:  It is.
>
> Wright:     I can't give you legal advice or anything like that.  If you want me to stop asking questions, but—
>
> Defendant:  ***I'm not gonna answer any more of your questions.***

18

Doc. 34-5 at 22 (Statement Three is in bold and italics). The Government states it will not seek to admit any of Defendant's statements made after Statement Three. Doc. 34 at 6. Therefore, to the extent Defendant seeks to suppress any statements he made during the interrogation after Statement Three, that request is moot.[7]

In sum, Defendant's waiver of his Miranda rights at the outset of the March 28, 2019 interrogation was valid and enforceable. Although Defendant expressed some reluctance to answer certain questions during the interrogation, described as Statement One and Statement Two above, Defendant's reluctance was specific to the subject matters of the questions and was not an unequivocal or unambiguous revocation of his waiver of Miranda rights. Regarding Statement Three, the Government states it will not rely on Defendant's statements after Statement Three, and, therefore, any request to suppress such statements is moot.

## CONCLUSION

Based on the foregoing reason, I **RECOMMEND** the Court **DENY** Defendant's Motion to Suppress. Doc. 29. The Government should be entitled to use statements preceding "I'm not gonna answer any more of your questions," but should not be entitled to use statements made after that point once Defendant invoked the right to remain silent. The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections within 14 **days** of the date on which this Report and Recommendation is entered. Any objections asserting that the Magistrate Judge failed to address any contention raised in the Complaint must also be included. Failure to do so will bar any later challenge or review of the

---

[7] Because of the Government's position regarding Statement Three, the Court need not determine whether Statement Three is a valid revocation of Defendant's waiver of Miranda rights. However, it should be noted that in Statement Three Defendant declines to answer "any more of [of the interrogator's] questions." That statement is broader than Statement One and Statement Two and indicates an unwillingness to participate in any further questioning, regardless of the topic.

factual findings or legal conclusions of the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a de novo determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a District Judge.

**SO ORDERED** and **REPORTED and RECOMMENDED**, this 25th day of November, 2019.

_____
BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA